ECF CASE

**Paul R. Levenson, Esq. (PL 8560)**
**Scott A. Ziluck, Esq. (SZ 4826)**
**KAPLAN & LEVENSON LLP**
**Attorneys for Plaintiffs**
**630 Third Avenue**
**New York, New York 10017**
**(212) 983-6900**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
**STEVEN BANKIN, et al.,**

                    **Plaintiffs,**

                                                        **CV-00-0504 (JS)(WDW)**

        **- against -**

**THE TOWN OF  ISLIP, et al.,**

                    **Defendants.**
--------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**
**DISMISSING THE COUNTERCLAIMS OF THE INDIVIDUAL**
**BID/CHAMBER DEFENDANTS**

                              **KAPLAN & LEVENSON LLP**
                              **Attorneys for Plaintiff**

                              **630 Third Avenue**
                              **New York, NY 10017**
                              **(212) 983-6900**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................iii-iv

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS .........................................................................................2

    A. Plaintiffs' Claims .........................................................................................2

    B. The Counterclaims .......................................................................................4

    C. Background ....................................................................................................4

    D. The Town's Unjustified Opposition to the Bankin Project...............................5

    E. The Town's Improper Requirement of BID and Chamber
       Approval of the Bankin Project ........................................................................6

    F. Legal Advice to the BID and Chamber Contrary to Town's Position................7

    G. Opposition of the BID and Chamber to the Bankin Project .............................7

    H. The Town's Motives .....................................................................................9

    I. The BID's Motives ........................................................................................10

    J. The Chamber's Motives ................................................................................11

    K. Imposition of Covenants and Restrictions ....................................................12

       i. The Arzt Meeting.......................................................................................16

    L. Bankin's Agreement to Covenants and Restrictions .......................................17

    M. Treatment For Similarly Situated Properties..................................................17

    N. 44-46 East Main Street.................................................................................18

    O. Incorporation...............................................................................................19

ARGUMENT..............................................................................................................20

    Standards Applicable To The Motion...................................................................20

POINT I:

THE INDIVIDUALS BID/CHAMBER DEFENDANTS' SLAPP
COUNTERCLAIMS SHOULD BE DISMISSED ..........................................................21

A. SLAPP Standards ..............................................................................................................21

B. Plaintiff Bankin is Not a Public Permittee With Regard to Incorporation Petition and
This is not an Action Involving Public Petition and Participation to the Extent it
Concerns Incorporation .......................................................................................................22

C. This is Not an Action Involving Public Petition and Participation With Respect to the
Individual BID/Chamber Defendants' Role in Plaintiffs' Land Use Application ............24

D. This Action Was Commenced and Continued With a Substantial Basis
In Both Fact and Law .........................................................................................................25

CONCLUSION...................................................................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)................................................................20

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................................................20

D'Amico v. City of New York, 132 F.3d 145 (2d Cir.), cert. denied, 524 U.S. 911 (1998)... 20-21

Ehrens v. Lutheran Church, 385 F.3d 232 (2d Cir. 2004) .............................................................20

Friends of Rockland Shelter Animals, Inc. v. Mullen, 313 F. Supp. 2d 339
(S.D.N.Y. 2004).......................................................................................................................22

Golden Pacific Bancorp. v. F.D.I.C., 375 F.3d 196 (2d Cir. 2004) ...............................................20

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)...........................21

Yeshiva Chofetz Chaim Radin, Inc. v. Village of New Hempstead by its Board of
Trustees of Village of New Hempstead, 98 F. Supp. 2d 347 (S.D.N.Y. 2000).................22, 24

### STATE CASES

Street Beat Sportswear, Inc. v. National Mobilization Against Sweatshops, 182 Misc. 2d
447 (Sup. Ct. N.Y. Co. 1999) ..................................................................................................22

### FEDERAL STATUTES

42 U.S.C. §§ 1983, 1985, 3604 and 3617 .......................................................................................2

Fed. R. Civ. P. 11 ............................................................................................................................1

Fed.R.Civ.P. 56(c) ........................................................................................................................20

Fed.R.Civ.P. 56(e) ........................................................................................................................20

### STATE STATUTES

N.Y. Civ. Rights Law § 70-a ..........................................................................................1, 4, 21, 25

N.Y. Civ. Rights Law §76-a ..................................................................................................... 21-23

N.Y. Village Law §2-202(f).................................................................................................... 22-23

Plaintiffs Steven Bankin ("Bankin") and his wholly-owned businesses Great South Bay Development Corp. ("Great South Bay"), South Shore Land Corp. ("South Shore"), and Bay Shore Land Corp. ("Bay Shore Land") respectfully submit this memorandum of law in support of their motion for summary judgment seeking dismissal of each of the counterclaims filed by defendants Frank Whitehouse ("Whitehouse"), William Beitch ("Beitch"), Lorraine Lovgren ("Lovgren"), Bruce Brownyard, Donna Perriconi ("Perriconi"), Brian Brownyard, and Anne Higbie ("Higbie") (collectively the "Individual BID/Chamber Defendants")[1].

## PRELIMINARY STATEMENT

The Individual BID/Chamber Defendants contend that plaintiffs' claims against them are frivolous and were asserted against them in violation of New York Civil Rights Law § 70-a for the purpose of harassing, intimidating or punishing them for their exercise of speech, petition or association rights because they (a) voiced opposition to plaintiffs' real estate projects, and (b) were opposed to the incorporation of a village of Bay Shore ("Incorporation"), which Bankin allegedly supported.

To survive plaintiffs' motion for summary judgment, the Individual BID/Chamber Defendants must demonstrate that this action is without merit in fact or law (§ 70-a essentially mirrors the standard of Fed. R. Civ. P. 11). In denying defendants' motions to dismiss the complaint, this Court has already determined that plaintiffs' claims are well-founded in law. The evidence now also demonstrates that the claims are supported by the facts: the Individual BID/Chamber Defendants (as well as the BID and the Chamber themselves) actively conspired with the Town of Islip (the "Town") to deprive plaintiffs of their constitutional and Fair Housing Act rights in furtherance of discriminatory policies to discourage or prevent the development of

---

[1]     This action was previously discontinued against defendant Edwin Finder pursuant to a stipulation of settlement. The parties have reached a settlement in principle regarding plaintiffs' claims against Margaret Maloney and George Rider, and Maloney and Rider's counterclaims against plaintiff Bankin. A stipulation of discontinuance will be filed with the Court once executed.

housing in downtown Bay Shore for low income and subsidized tenants, minorities and families with children. Specifically, the Individual BID/Chamber Defendants: (a) were delegated the authority to approve or disapprove plaintiffs' proposed project at the Main Street Property and actively undertook that function; (b) worked closely with the Town to review the project and to develop alternative uses and/or controls to be imposed on plaintiffs to remove control of the property from Bankin; (c) formulated and actively negotiated discriminatory covenants and restrictions for plaintiffs' properties that were not imposed on similarly situated properties; and (d) otherwise interfered with Bankin's rights to own, use, enjoy, improve, sell and/or lease his properties.

The contention that Bankin selectively chose members of the BID and Chamber as defendants because of their personal viewpoints on Incorporation is similarly baseless because (a) Bankin was largely unaware of the views of the Individual BID/Chamber Defendants on Incorporation; (b) Bankin, in some cases, believed that certain of the Individual BID/Chamber Defendants actually supported Incorporation; (c) the Citizen's Committee to Incorporate Bay Shore had no involvement whatsoever in Bankin's prosecution of this action; and, most importantly, (d) there is no evidence that this action was commenced for any collateral objective.

## STATEMENT OF FACTS

### A.     Plaintiffs' Claims

This action, brought pursuant to 42 U.S.C. §§ 1983, 1985, 3604 and 3617, challenges the defendants' actions in connection with plaintiffs' ownership of four properties in the hamlet of Bay Shore, located within the Town of Islip. Plaintiffs allege that defendants conspired and acted to (a) prevent plaintiffs from developing properties that defendants believed would be rented to low income and subsidized tenants, minorities, and families with children, (b) because of their racial bias against Bankin and his prospective tenants, and (c) their personal and political

animus against Bankin because of his involvement in the Incorporation effort. Specifically, the

defendants pursued these objectives, inter alia, by:

- the Town refusing to issue building permits to allow plaintiffs to reconfigure, enlarge and renovate apartments at the Main Street Property through the unfounded and arbitrary designation of the property as a non-conforming use that had been abandoned despite the facts that (a) the Main Street Property had a valid special permit that gave plaintiffs the right develop the property as intended; (b) the Town conducted no investigation to form the conclusion that the property had been abandoned; (c) even if the property was properly designated a non-conforming use by the Town, plaintiffs still had the right to develop the property as a legal non-conforming use; and (d) the Town never intended to enforce (nor did it ever enforce) the Amortization Law which formed the basis for its denial of permits to plaintiffs;

- the Town requiring plaintiffs to obtain the approval of the BID and the Chamber for their projects and on covenants and restrictions before the Town would approve plaintiffs' permit applications, despite the fact that no other similarly situated property owner required similar approvals;

- the BID and Chamber Defendants discriminating against plaintiffs because they viewed Bankin as a "Jewish slumlord" and they feared that he would rent the Main Street Property to low income and subsidized tenants, minorities and families with children;

- the BID and Chamber Defendants conditioning their approval of the Bankin Project on the imposition of unreasonably strict and burdensome covenants and restrictions that were not demanded for other similarly situated properties;

- the Town and the BID and Chamber Defendants inducing plaintiffs to agree to unreasonably strict and burdensome covenants and restrictions by repeatedly telling Bankin that all other similarly situated properties would be forced to comply with the Amortization Law and agree to similar covenants and restrictions;

- Defendant Perriconi interfering with plaintiffs attempts to sell or lease 44-46 East Main Street.

**B.     The Counterclaims**

Each of the Individual BID/Chamber Defendants asserted a counterclaim under New York Civil Rights Law § 70-a, alleging that Bankin commenced this action for the purpose of harassing, intimidating, punishing or otherwise chilling their exercise of speech, petition or association rights (copies of the counterclaims are attached as Exhibits 2-8 to the Ziluck Declaration). They each allege that they (1) consistently opposed Incorporation and that this fact was known by Bankin and "his fellow political adherents," (2) opposed some of Bankin's applications to the Town, and (3) in some cases, were warned by "political allies of plaintiff Bankin" against exercising their right to comment on Incorporation.     The Individual BID/Chamber Defendants further allege that Bankin is a "public permittee" (as defined by New York Civil Rights Law § 76-a) by virtue of his permit applications to the Town and because he signed the Incorporation petition.   As demonstrated below, each of these counterclaims is meritless and unsupported by evidence.

**C.     Background**

Bankin is a real estate developer who is the sole owner of the three corporate plaintiffs (¶2).[2]  Each of the corporations was formed solely for the purpose of operating one or more of the real properties that are the subject of this lawsuit. Great South Bay is the owner of property located at 1-3 West Main Street, 2-8 (even numbers) Fourth Avenue, Bay Shore, New York (the "Main Street Property") which was purchased in 1994 (¶21).  At the time of its purchase, the Main Street Property operated under a special permit which permitted the property to operate as a mixed use—with commercial occupancy on the first floor and residential occupancy on the upper floors (the "Special Permit") (¶23).  Bankin intended to develop the property with the

---

[2]     References to "¶ _" are to Plaintiffs' Statement Pursuant to Local Civil Rule 56.1, dated May 31, 2005. Complete evidentiary citations to the facts cited herein are contained in the 56.1 statement.

upper floors of the building utilized for rental apartments and the first floor for commercial use (the "Bankin Project"), as it had been utilized for decades (¶24).

**D.      The Town's Unjustified Opposition to the Bankin Project**

Shortly after purchasing the Main Street Property, Bankin was advised by the Islip Building Department and Town Attorney's Office that the Special Permit was no longer valid because of amendments to the Islip Town Code, and that therefore the mixed use of the property had become a non-conforming use (¶26).  Bankin was further advised by defendants Islip Town Attorney Vincent J. Messina, Jr. ("Messina") and Islip Planning Commissioner Thomas A. Isles ("Isles") that the non-conforming use had been lost by abandonment because it had been discontinued for more than one year and that even if it had not been lost, Bankin could not receive a permit to alter the existing mixed use at the property since all non-conforming uses were going to be phased out within five years in accordance with the Town's Amortization Program pursuant to Islip Town Code § 68-15(E) (the "Amortization Law") (¶27).  However: (a) the Amortization Law specifically allowed mixed uses to continue in the area where the Main Street Property was located, and (b) the Town had no intention of enforcing the Amortization Law against any property subject to its provisions (a fact later acknowledged by Isles and Messina) (¶27).

On or about June 5, 1995, Isles, ignoring that the Amortization Law expressly permitted mixed uses in the area where the Main Street Property was located, falsely advised Bankin that because his project was not permissible under the Town Code and could jeopardize the Town's plans to affirmatively phase out residential uses in downtown Bay Shore, an amendment to the Town Code was necessary before the Bankin Project could proceed (¶28). Isles later admitted to Bankin that the Town never intended to enforce the Amortization Law, and that the law was not intended to phase out mixed use properties, but rather to cause mixed

use property owners to upgrade their properties. Isles also admitted that the Town opposed the Bankin Project because it would likely result in housing for minorities, social service recipients, Section 8 or other subsidized tenants, and families with children (¶29).

During late 1994 through June 1995, Bankin negotiated with Messina, Isles, and other Town representatives, and representatives of both the BID and Chamber, who were included in the negotiations by the Town (¶30). The Town, BID and Chamber representatives persisted in (a) their position that mixed uses were not permitted or desired at the Main Street Property and that the Bankin Project was a departure from the Town's policy of phasing out residential uses in downtown Bay Shore and could jeopardize the Town's "Amortization Program", and (b) their demand that Bankin explore alternative uses for the property and agree to turn over control of the property to a third party such as the BID (¶31). Despite these positions, the Town expressly acknowledged Bankin's legal right to develop a mixed use at the property by issuing a permit for structural repairs for a "retail/apartment" use in the "BD Zone" for the Main Street Property (¶32).

## E.   The Town's Improper Requirement of BID and Chamber Approval of the Bankin Project

Bankin was told by Messina and Isles that the Town, the BID and the Chamber wanted Bankin to develop the Main Street Property for a use other than the existing mixed use that Bankin intended to continue (¶33).

In June 1995, Bankin also was expressly advised by defendant Islip Town Supervisor Peter McGowan ("McGowan"), Isles, Messina, defendant Islip Deputy Commisioner of Planning Daniel J. Gulizio ("Gulizio"), and other Town representatives that the Town would not even consider any application regarding the Main Street Property, or any evaluation of a possible amendment to the Town Code, unless Bankin first received 100% written approval of his project from both the BID and the Chamber Boards of Directors (which included the Individual

{00077255.1 / 0538-001}                                      6

BID/Chamber Defendants) (¶34). This requirement was imposed even though McGowan, Isles Messina, and Gulizio knew that (a) the BID previously had opposed all upper floor residential uses on Main Street, (b) members of both the BID and Chamber were strongly opposed to any residential uses in downtown Bay Shore, and (c) certain BID board members were appointed to their positions by McGowan (¶35). McGowan and Messina directed Perriconi, then the president of the Chamber, to coordinate Bankin's presentations to the BID and Chamber seeking their approval for his project (¶36).

**F.   Legal Advice to the BID and Chamber Contrary to Town's Position**

Shortly after being asked by the Town to review Bankin's application, the BID and Chamber, through Perriconi and BID Executive Director Edwin Finder ("Finder"), sought and received legal advice concerning the Amortization Law and the Special Permit from local Bay Shore attorneys Andrew Siben and Frederick Fagelson (¶37). Mr. Siben and Mr. Fagelson advised that: (a) the Main Street Property operated under a valid special permit which was not and could not be lost by the passage of the Amortization Law or by abandonment; (b) the Amortization Law did not apply to the Main Street Property and could not legally be used to take away Bankin's right to develop and rent residential apartments at the Main Street Property; (c) in view of the valid Special Permit, the Town's designation of the Main Street Property as a "nonconforming use" was incorrect; and (d) the Town could not lawfully revoke the Special Permit without notice and due process (¶37).

**G.   Opposition of the BID and Chamber to the Bankin Project**

On June 7, 1995, the Chamber held an "emergency" executive committee meeting to discuss the Bankin Project (¶38). At that meeting, the Chamber "took a very similar position to the BID expressing concerns about precedents that might undermine the Town Ordinance, about the economic viability of 'luxury' rentals at this time in Bay Shore's revitalization, and regarding

zoning issues affecting the subject property involving special permits and non-conforming uses."

(The Bankin Project included conversion of fourteen existing apartments into nine "luxury"

apartments) (¶39). The Chamber requested additional information from the Town regarding

"zoning status of the subject property with respect to any applicable special permits vs. non-

conforming uses" and indicated that it was "working with the Town with respect to this legal

research as well as with regard to developing categories of viable residential uses potentially

applicable to upper floors of Main Street area properties and consistent with overall economic

objectives in Bay Shore" (¶39). On June 20, 1995, defendant Whitehouse, then the BID

President and a member of the Chamber board, reported the Chamber's opposition to the Bankin

Project to the BID Board and to Isles (¶40).

At the direct request of the Town, the BID reviewed the Bankin Project at meetings on

June 20 and July 19, 1995 (¶41). The BID Board knew that the Town would only allow Bankin

to proceed with his project if there was "broad and unequivocal support for Mr. Bankin's project

from the Bay Shore business community" and approval by the BID and Chamber (¶42). After

the July 19, 1995 meeting, the BID Board disapproved the Bankin Project and determined that

development of upper floor residential uses was not "consistent with the overall economic

objective **inherent** in the Bay Shore Revitalization Action Plan" (emphasis added). Therefore,

the BID Board unanimously concluded "to continue to support the **basic thrust** and intent of the

Town Ordinance, enacted at the request of the business community, that provides for the

amortization of upper floor residential uses in Bay Shore by 1997" (emphasis added). The BID

Board directed its executive director, Finder, "to continue to work with Mr. Bankin" to "help

identify a program for his Main Street properties" other than the use Bankin intended. The BID

communicated its position on the Bankin Project to McGowan, Perriconi, Messina and Isles

(¶43).

## H.     The Town's Motives

In or about July 1995, Bankin's architect Charles Kuehn met with Isles to discuss the Bankin Project. During that meeting, Isles told Kuehn that neither he nor the Town wanted the Bankin Project to go forward because: (a) Bankin was lying about his proposal to build luxury apartments; (b) Bankin's proposal to build luxury apartments was not feasible; (c) even if Bankin was being truthful about his intention to develop luxury apartments, he would fail in that endeavor and would have to resort to renting to low income tenants and other so-called undesirables, and (d) the Town did not want low income tenants residing at the Main Street Property (¶44).

In or about July 1995, Finder, Whitehouse and Isles met to discuss the Bankin Project. During that meeting, Isles expressed "concern for the effect that the Bankin Project would have on the enforcement of the Town Ordinance," and explored "alternative uses for the Main Street Property" consistent with the Town's policy (¶45). On July 28, 1995, Finder, on behalf of the BID, wrote to Isles to identify alternative uses and control procedures for the Main Street Property that potentially could be imposed on Bankin. Specifically, Finder identified the following possibilities to further the Town's and the BID's shared agenda: (a) upon completion of the renovation, Bankin would turn over the property to a local entity such as the BID or the Town of Islip Community Development Agency, and then the local entity would hire an "independent private leasing and management agent that leases residential units, manages the properties pursuant to specific tenanting and management standards" with the leasehold lasting five or ten years "to assure the property is on 'right track'"; and (b) having the Town adopt an ordinance that permitted work/living spaces in certain zones with specific standards such as "the units are for families and individuals without children [or] professional people". The ordinance would "have licenses renewable by Town every two years based upon inspection of premises and

adherence to established occupancy tenancy standards" with the landlord paying a licensing fee to the Town. Finder also requested that Isles and Messina provide their comments to these suggestions for Bankin's property (¶46).

Isles again admitted to Finder in a conversation in late 1995 that the Town opposed the Bankin Project because Bankin's proposal to build "luxury" apartments was "bullshit" because such apartments were not economically feasible and therefore, would revert to low income and subsidized housing, and (b) because the "luxury" apartments were not feasible, Bankin had to be lying about his intentions for the property (¶47).

Gulizio admitted that the Town opposed the Bankin Project because "everybody was concerned about the type of occupants and the second floor occupancy within the downtown" (¶48).

## I.   **The BID's Motives**

Although the BID purported to base its disapproval of the Bankin Project on the Revitalization Action Plan (the "RAP"—a planning document for the revitalization of Bay Shore formulated by the BID and approved by the Town) and the Amortization Law, it (a) did not review the property records for the Main Street Property to review is zoning status and impact of the Amortization Law, and (b) was advised by Finder (who initially drafted the RAP and reviewed Bankin's special permit, certificate of occupancy and the Amortization Law) that Bankin's proposal was **not** inconsistent with either the Amortization Law or the RAP (¶49). Not surprisingly, many BID Board members (including defendants Bruce Brownyard, Beitch, Higbie, and Lovgren) subsequently admitted that, contrary to the BID's purported rationale for disapproval of the Bankin Project, neither the Amortization Law nor the RAP had anything to do with their opposition to the Bankin Project (¶50).

The BID's disapproval of the project was actually based on the BID Board members' beliefs that: (a) Bankin did not actually intend to develop luxury apartments; (b) even if Bankin were being truthful about his intentions to develop luxury apartments, he would not be successful because such apartments were not economically viable, and "normal people" would not rent them; (c) the apartments would ultimately be rented to low income and subsidized tenants, minorities, and families with children; (d) the possible occupancy by such tenants was undesirable; (e) all housing on Main Street should be eliminated; and (f) the BID should cooperate with the Town's agenda (¶51). The BID also opposed the Bankin Project because it viewed Bankin as: (a) a absentee landlord; (b) a "Jewish slumlord"; (c) a Democrat or "political outcast"; (d) an outsider who was "not one of us"; and (e) of the same ilk as the previous owner of the Main Street Property and other "problem" buildings in Bay Shore. <u>Each of the BID Board members, including Whitehouse, Beitch, Lovgren, Higbie, and Bruce Brownyard, disapproval of the Bankin Project was motivated by these beliefs</u> (¶51).

## J.   **The Chamber's Motives**

On or about August 3, 1995, the Chamber Board met to vote on the Bankin Project (¶52). Ten board members voted, five in favor of the project and five opposed to the project (¶52). Thereafter, during August and September 1995, each of the Chamber Board members who voted against the Bankin Project, Whitehouse, Beitch, Higbie, and Lovgren, as well as Perriconi and Bryan Brownyard, expressed concern about: (a) the viability of luxury apartments; (b) slumlords; (c) absentee landlords; (d) the type of tenants they expected would reside at the Main Street Property, including, low income and subsidized tenants, minorities, and families with children; (e) Bankin not being truthful about the types of apartments he intended to develop and the types of people he intended to rent to; and (f) Bankin being an "outsider", a "Jewish

slumlord", a Democrat, an "out-of-towner", and not being different from the previous owners of the Main Street Property and other similar properties (¶53).

Chamber Board member Bryan Brownyard admitted that the Chamber Board opposed the Bankin Project because it did not want any "Third Worlders," "those people," "those creeps" or "monkeys" living in the area (¶54). Another Chamber Board member, defendant Lorraine Lovgren, admitted that she supported the Amortization Law because she: (a) did not want Bay Shore to "look like the Bronx" (based on what she saw of the Bronx on television and the news), and (b) opposed residential uses on Main Street, particularly by families with children (¶55).

**K.      Imposition of Covenants and Restrictions**

By letter to McGowan dated September 15, 1995, the BID reiterated its opposition to the Bankin Project because it wanted to "support the basic thrust of current Town of Islip policy inherent in the [Amortization Law]". The BID also indicated that it would "continue to work with" McGowan and other Town employees to explore alternative uses and controls for the Main Street Property. Finder and Whitehouse then met with McGowan to review the Bankin Project, and the Town thereafter formed a committee which included the Town Attorney, the Town Planning Department, the BID, the Chamber, and Bankin, to "**work together to set up covenants and restrictions for density, leases, etc.**" and to "**reach an accord and finalize an agreement**" between Bankin, the Town, the Chamber and the BID that would allow the project to proceed (emphasis added) (¶56). Messina and Isles told Bankin that the Town would not allow the Bankin Project to go forward unless Bankin reached and agreement with the BID and Chamber on acceptable covenants and restrictions (¶57).

In a series of meetings in September, October and November 1995, Bankin and his attorneys met with Town Attorney Messina, Chamber President Perriconi, BID Executive Director Finder, and Town Planning Commissioner Isles, in an attempt to reach an agreement on

covenants and restrictions for Bankin's properties (¶58).  At those meetings, Bankin indicated that he wanted to be able to develop the Main Street Property for luxury apartment residential use and that he wanted to be able to operate his own property (¶58).  Finder and Perriconi both indicated that the Chamber and the BID would only approve the Bankin Project for residential use if it had the following controls on density and quality: (a) no single room occupancies; (b) minimum one year lease terms; (c) no subletting or underletting; (d) minimum apartment sizes; (e) only one studio apartment with all other apartments being 1-3 bedrooms; (f) maximum number of occupants per apartment; and (g) a connection between the commercial and residential portions of the building (e.g. living and working space for the same people) (collectively the "BID/Chamber C&R Demands") (¶58).

During December 1995 through May 1996, Bankin and his representatives continued to negotiate the covenants and restrictions for the Main Street Property with Isles, Messina, Finder, Perriconi, and other representatives of the BID and the Chamber (¶59).  The BID and Chamber persisted in conditioning their approval on inclusion of the BID/Chamber C&R Demands.  No agreement was reached (¶59).

In or about May 1996, the Town proposed a set of covenants and restrictions to Bankin which did not include the BID/Chamber C&R Demands (except for the requirement of one year minimum lease terms) (¶60).  As a result, Bankin, under the financial duress caused by the Main Street Property being kept closed for over two years, agreed to the Town's proposed covenants and restrictions, despite the inclusion of several which Bankin found objectionable (including the right of the Town to inspect the leases upon demand, and the right of the Town to rescind its approval based on any violation at the property)(the "Agreed C&R's") (¶60).

Bankin's application was noticed for a public hearing before the Town Board for July 18, 1996 (¶61).  However, only a few hours before the hearing, Deputy Planning Commissioner

Gulizio transmitted a revised set of covenants and restrictions to Bankin's attorney that again included many of the BID/Chamber C&R Demands (including restrictions on apartment size, the number of occupants, subletting, the number of bedrooms, and a ban on single room occupancies), even though these were not previously included in the Agreed C&R's (¶62). That night at the Town Board hearing, however, the newly revised covenants and restrictions were not presented to the Town Board; instead, the Town Board approved the Agreed C&R's (¶62). No member of the community, including any members of the BID or Chamber Boards, made any statements at the hearing (¶62).

Approximately six weeks after the hearing, Gulizio sent Bankin a new set of covenants and restrictions for signature for filing with the County Clerk (¶63). However, the covenants and restrictions Bankin was asked to sign were not the ones approved by the Town Board, but included many of the BID/Chamber C&R Demands which were included on the set of covenants and restrictions transmitted to Bankin by Gulizio on the day of the hearing (including restrictions on apartment size, the number of occupants, subletting, the number of bedrooms, and a ban on single room occupancies). Bankin refused to sign the altered covenants and restrictions (¶63).

During the period July 1996 through February 1997, Bankin engaged in extensive negotiations with Gulizio, Messina and other Town employees, and, at the direction of the Town, with BID and Chamber representatives (¶64). Bankin was repeatedly told by Isles, Gulizio, Messina, Perriconi, and Finder during this time that all other similarly situated property owners would be required to comply with the Amortization Law and to agree to similar covenants and restrictions (¶64). Isles, Gulizio and Messina again told Bankin that he was required to reach an agreement with the BID and Chamber on covenants and restrictions before he would be allowed to proceed with his project (¶64).

During the period July 1996 through April 1997, Timothy J. Mattimore, Jr., Esq. ("Mattimore"), the BID's attorney and liaison with the Town, had several meetings with Town representatives, including defendants Isles and Gulizio, regarding the Bankin Project (¶65). Mattimore conveyed to Isles and Gulizio specific covenants and restrictions that the BID insisted be imposed on the Main Street Property including, among others, a restriction on the maximum number of occupants that could reside in each of the apartments (¶65). Both Gulizio and Isles told Mattimore that the BID and the Chamber had to approve the covenants and restrictions before the project could go forward (¶65). Gulizio told Mattimore that the requirement that BID and Chamber approval was required before the Bankin Project could proceed came at the direction of McGowan (¶65). During this time, Bankin continued to refuse to agree to the demanded covenants and restrictions and complained to the Town, the BID and the Chamber that at least one other similarly situated property was approved without having to agree to similar covenants and restrictions (¶66).

In or about August 1996, Perriconi advised Bankin that if he did not stop complaining that he was the subject of unequal treatment by the Town, the BID, and the Chamber, he "would never be able to live and work in this Town" and that "sometimes life is unfair, too bad" (¶67). In or about August 1996, Bankin met with McGowan and complained that another property that was similarly situated to the Main Street Property was approved by the Town Board at the hearing on July 18, 1996 (the same night Bankin appeared) without having: (a) to obtain BID or Chamber approval, and (b) to agree to the covenants and restrictions that were being demanded for my property. McGowan demanded that Bankin leave his office saying "get the fuck out of my office. I am up to here with your unequal treatment" (¶68).

### i.    The Arzt Meeting

On or about February 1, 1997, Bankin met with Perriconi, Whitehouse, Rider, Mattimore, and local realtor Henry Arzt, who coordinated the meeting (the "Arzt Meeting") (¶69).  At the Arzt Meeting, Whitehouse and Perriconi told Bankin that the BID and the Chamber's "approbation and agreement on the covenants and restrictions would have to be worked out prior to the application being granted" (¶70).  Whitehouse, Perriconi and Rider admitted that the main focus of the BID and the Chamber was to control the Main Street Property so that it could not be occupied by low income or subsidized tenants, minorities, and families with children (¶71).  The following covenants and restrictions were discussed, among others, in order to address these concerns of the BID and Chamber: (a) limitations on the number of occupants; (b) minimum lease terms; (c) restrictions on subletting and underletting; (d) limitations on the number of people that could reside in each apartment; and (e) square footage minimums for each apartment (¶72).

At the Arzt Meeting, Whitehouse and Perriconi stated that if Bankin would not agree to these covenants and restrictions, then the BID and Chamber would approve the Bankin Project only if Bankin agreed to control procedures which would effectively remove control of the property from Bankin's hands (¶73).  Whitehouse also admitted that the BID: (a) did not want the project to go forward under any set of circumstances; (b) feared low income housing and the tenants that would reside in low income housing; and (c) the BID, the Chamber, and the Town had to have as much control as possible over the property if the project was to go forward (¶74). Perriconi, on behalf of the Chamber and as Executive Director of the BID (having replaced Finder), indicated that she would approve the Bankin Project only if Bankin agreed to the demanded covenants and restrictions so that the property did not turn into low income housing

and could be controlled by the Town, the BID, and the Chamber (¶75).  No agreement on covenants and restrictions was reached at the Arzt Meeting (¶76).

**L.**     **Bankin's Agreement to Covenants and Restrictions**

In or about March 1997, with no compromise offered by the Town, the BID, or the Chamber, and suffering from extreme financial hardship caused by the Main Street Property being kept closed for almost three years, Bankin agreed to the demanded covenants and restrictions (¶77).  In obtaining Bankin's agreement, the Town, the BID and the Chamber expressly represented to Bankin that all other similarly situated properties would be forced to comply with the Amortization Law and to agree to the same covenants and restrictions that were required for his properties (¶78).

The Town Board held a hearing on April 10, 1997 at which Bankin's counsel consented to revised covenants and restrictions which included, among others, the following: (a) minimum apartment sizes; (b) a requirement that only one apartment be used as a studio, with the remaining apartments all having at least one bedroom; (c) a requirement that occupancy of each apartment be conditioned on a lease; (d) a prohibition against transient occupancy; (e) a requirement that copies of all leases be provided to the Town Attorney upon demand; (f) a prohibition against underletting and subleasing any portion of any apartment; and (g) a requirement that the first floor commercial use be occupied within thirty-six months.[3]  No member of the BID or the Chamber spoke at the public hearing (¶79).

**M.**     **Treatment For Similarly Situated Properties**

Despite the existence of numerous properties similarly situated to the Main Street Property, no other property was required to comply with the Amortization Law (the Town has

---

[3]     At the same time, Bankin was also required to agree to covenants and restrictions for his other properties at 19 West Main Street and 10-12 Fourth Avenue which were also demanded by the BID and Chamber (¶79).

not enforced the Amortization Law against any other property in Islip), and no other property was ever required to agree to covenants and restrictions similar to those imposed on the Main Street Property (¶¶81-96).  No other property owner in Bay Shore was required to obtain BID or Chamber approval before an application would be considered or approved by the Town.[4]

## N.   **44-46 East Main Street**

44-46 East Main Street ("44-46") is a property that was owned by Bay Shore Land from early 1999 through December, 1999 (¶98).  Shortly after its acquisition, Bankin commenced efforts to rent or sell the property (¶99).  In or about May or June 1999, Bankin met with a prospective tenant or purchaser who wanted to use the property to operate a gay/lesbian organization (¶100).  During the course of the meeting, which occurred in front of the property, Perriconi approached the prospective tenant/purchaser and stated the property could not be used as a meeting house because "there is no public assembly on Main Street" and "we are not issuing permits or certificates for buildings on Main Street" (¶100).  This encounter was a factor in the prospective tenant/purchaser not reaching an agreement with Bankin (¶100).

In or about October 1999, Bankin entered into negotiations with another prospective purchaser, James Remini.  Shortly after negotiations commenced, Perriconi approached Mr. Remini, identifying herself as a representative of the Town of Islip Community Development Agency ("CDA") (despite the fact that at the time she was not affiliated with the CDA, but rather was the Chamber President and the paid executive director of the BID), told him that: (a) Remini should not deal with Bankin because he was a "jerk", "asshole" and "not our kind of person"; (b) Remini was "better off" not dealing with Bankin because Bankin "does not have the same vision of Bay Shore as we do," and (c) "there is no more housing on Main Street" (¶101).  Perriconi

---

[4]   Only one other similarly situated property's application was ever mentioned at a BID or Chamber meeting. On the one occasion where that occurred, the BID Board "deferred consideration" of the application and never discussed it again at a BID meeting (¶97).

tried to direct Remini to buildings other than 44-46 and indicated that she was interested on behalf of the CDA in purchasing the building (¶101).

## O.   Incorporation

As part of their counterclaim, the Individual BID/Chamber Defendants allege that Bankin commenced this action because each of them opposed Incorporation, a movement which Bankin supported.

In or about 1997, the Citizen's Committee to Incorporate the Village of Bay Shore, Inc. (the "Citizen's Committee") was formed for the purpose of exploring Incorporation (¶102). Bankin was not involved in any Incorporation efforts until late 1997 or early 1998 (¶103). Although Bankin was listed as a director of the Citizen's Committee, he: (a) was not an officer or leader of the group, and (b) had no role in forming or directing any of the policies or actions of the committee or its directors or officers (¶104).

Bankin was not aware of Beitch's, Whitehouse's, Higbie's, Bryan Brownyard's, or Lovgren's viewpoints on Incorporation (¶105). Whitehouse had no view on Incorporation ("I cannot and will not speak out on the issues, because I have no view on it") (¶106). The Incorporation movement started after Lovgren moved from Bay Shore to Florida and she never communicated with anyone about the issue after she left (¶108). Higbie did not align herself either in favor or against Incorporation (¶107). Before the commencement of this action, Bankin knew that Bruce Brownyard was in favor of Incorporation because he specifically told Bankin he thought it was a good idea and asked if he could sign the Incorporation petition (¶109). Perriconi was opposed to Incorporation, but spoke freely about her views on the issue before and after the filing of this action (¶110).

On multiple occasions, Perriconi threatened individuals who supported Incorporation and told them that they would have problems in their dealings with the Town if they continued

their support (¶111). In or about the Summer of 1998, former defendant George Rider, then a member of the BID Board, told Bankin that if he gave up his support for Incorporation, he would get the permits he wanted for the Main Street Property (¶112).

The Citizen's Committee had no involvement of any kind in this action or its prosecution (¶113). Bankin had no involvement whatsoever in the communications identified by the BID/Chamber defendants as "threats" made by Bankin's "fellow political adherents" and, in any event, such communications (a) were not threats, and (b) have no connection to this action (¶114).

## ARGUMENT

### Standards Applicable to the Motion

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004); Golden Pacific Bancorp. v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The movant has the burden of establishing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant satisfies this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324. To this end, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New

{00077255.1 / 0538-001}                    20

York, 132 F.3d 145, 149 (2d Cir.), cert. denied, 524 U.S. 911 (1998). In other words, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, (1986) (footnote omitted).

**POINT I**

**THE INDIVIDUAL BID/CHAMBER DEFENDANTS'
SLAPP COUNTERCLAIMS SHOULD BE DISMISSED**

A.      **SLAPP Standards**

New York's anti-SLAPP[5] Law, NY Civil Rights Law § 70-a, provides, in relevant part, that "a defendant in an action involving public petition and participation" may recover damages, including costs and attorney's fees, from any person who commenced or continued such action if the defendant can demonstrate that the action "was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law." Civ. Rts. Law § 70-a(1)(a).

New York Civil Rights Law §76-a defines an "action involving public petition and participation"  as "an action . . .  that is brought by a public applicant or permittee, and is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission." Civ. Rts. Law § 76-a(1)(a). A "public applicant or permittee" is "any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body, or any person with an interest, connection or affiliation with such person that is materially related to such application or permission." Civ. Rts. Law § 76-a(1)(b).

The New York anti-SLAPP law was enacted in 1992 to "safeguard the 'free exercise of speech, petition and association rights', particularly as exercised by members of the public who

---

[5] "SLAPP" is an acronym for "strategic lawsuit against public participation."

are opposing a government action, against those who would try to interfere with a citizen's constitutional rights." <u>Yeshiva Chofetz Chaim Radin, Inc. v. Village of New Hempstead by its Bd. of Trustees of Village of New Hempstead</u>, 98 F.Supp.2d 347 (S.D.N.Y. 2000)(citations omitted). "The SLAPP statute is intended to prevent well-heeled public permit holders (or those seeking such permits) from using . . . the threat of personal damages and litigation costs . . . as a means of harassing, intimidating or . . . punishing individuals, unincorporated associations . . . and others who have involved themselves in public affairs by opposing them." <u>Street Beat Sportswear, Inc. v. National Mobilization Against Sweatshops</u>, 182 Misc.2d 447 (Sup. Ct. N.Y. Co. 1999). A plaintiff does not have to prevail in its lawsuit in order demonstrate that the action was not frivolous and was commenced with a substantial basis in law and fact. <u>Friends of Rockland Shelter Animals, Inc. v. Mullen</u>, 313 F.Supp.2d 339, 344 (S.D.N.Y. 2004).

**B.    Plaintiff Bankin is Not a Public Permittee With Regard to Incorporation Petition and This is Not an Action Involving Public <u>Petition And Participation to the Extent it Concerns Incorporation</u>**

To prevail on their SLAPP counterclaims against Bankin (the only defendant named in the counterclaims), the Individual BID/Chamber Defendants must first show that Bankin is a "public permittee" as defined in § 76-a. Plaintiffs do not dispute that Bankin is a public permittee with respect to plaintiffs' applications to the Town for land use permits and approvals. However, Bankin is not a "public permittee" with respect to the Incorporation petition.

By filing the petition to incorporate with the Town, the Citizen's Committee was not applying for (nor did it obtain) "a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body" as required by § 76-a. The only thing that the Citizen's Committee did was to submit the Incorporation petition to McGowan, as Town Supervisor, pursuant to New York Village Law § 2-202(f), to cause the

Town to schedule a hearing at which a **non-discretionary** determination was to be made as to whether the petition complied with the requirements of § 2-202 and was otherwise legally sufficient. As such, even if, <u>arguendo</u>, the petition could be attributed to Bankin merely because he was one of the over 2,000 people who signed it, the submission of the petition to the Town does not make the Citizen's Committee a "public applicant or permittee" as defined in § 76-a(1)(b).

However, even if the Court were to find that Bankin was a "public applicant or permittee" by virtue of signing the Incorporation petition, this action is not an "action involving public petition and participation" as defined in § 76-a(1)(a) which, in part, defines such action as one that "is brought by a public applicant or permittee, and is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission." The Individual BID/Chamber Defendants' counterclaims allege that they each "consistently opposed the proposed incorporation of a Village of Bay Shore." They do not allege, nor does the evidence in the record support, that any of them expressed any view on the legal sufficiency of the Incorporation petition—**which is the only issue that was before the Town**. As noted above, the Town did not, nor could it under the New York Village Law, evaluate the merits of the proposed Incorporation. Accordingly, even if the Individual BID/Chamber Defendants could prove that they opposed Incorporation, and that Bankin was aware of their views (which, as noted above, they largely cannot), this action does not "materially relate" to their efforts "to report on, comment on, rule on, challenge or oppose" the Town's review of the legal sufficiency of the Incorporation petition and as such this is not an "action involving public petition and participation."

**C.    This is Not an Action Involving Public Petition and
Participation With Respect to the Individual BID/Chamber
<u>Defendants' Role in Plaintiffs' Land Use Applications</u>**

As noted above, an "action involving public petition and participation" must be one

brought by a public permittee and must be "materially related to any efforts of the defendant to

report on, comment on, rule on, challenge or oppose such application or permission."  The clear

purpose of the SLAPP law was to protect the rights of individuals to freely express their

viewpoints on issues before governmental agencies—particularly where such rights are exercised

by members of the public who are opposing a government action in a public forum.  <u>Yeshiva</u>

<u>Chofetz Chaim Radin, Inc.</u>, 98 F.Supp.2d at 359-60.

As demonstrated in detail above, the Individual BID/Chamber Defendants were not

simply members of the public who were expressing their viewpoints on the Bankin Project to the

Town.  The clear uncontradicted evidence in the record is that Bankin was **required** to obtain

BID and Chamber approval for his project before he was allowed to proceed and had to agree to

the covenants and restrictions demanded by the BID and Chamber.  Moreover, the record is

replete with evidence of the BID and Chamber (including each of the Individual BID/Chamber

Defendants) acting in concert with the Town, in private meetings, to review plaintiffs'

applications, to negotiate covenants and restrictions for the properties, and to try to compel

plaintiffs to cede control or make other uses of their properties – to prevent plaintiffs from

renting their properties to low income or subsidized tenants, minorities, and families with

children.

Accordingly, this action is not materially related to the Individual BID/Chamber

Defendants' efforts to assert their First Amendment rights to speak out against plaintiffs'

applications, and the SLAPP counterclaims should be dismissed.

**D.      This Action Was Commenced and Continued**
**With A Substantial Basis In Both Fact and Law**

Even if the Court were to determine that this is an action involving public petition and

participation, summary judgment should be granted because this action was commenced and

continued with a substantial basis in fact and law.  See N.Y. Civ. Rights Law § 70-a.

This Court already has denied defendants' motions to dismiss this action, and held that

plaintiffs' claims are well-grounded in law (a copy of the Court's decision is attached as Exhibit

13 to the Ziluck Declaration).   The facts adduced through discovery (as set forth above)

demonstrate that plaintiffs have substantial evidence to support their well-pleaded claims.

Plaintiffs anticipate that the Court will evaluate and rule on all of the parties' respective

summary judgment motions at the same time.  Therefore, the Court is respectfully referred to

plaintiffs' contemplated opposition to the summary judgment motions that will be served by the

Town, the Individual Town Defendants, the BID, the Chamber, and the Individual BID/Chamber

Defendants for a full review of the legal merits of plaintiffs' claims.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment dismissing the

counterclaims of the Individual BID/Chamber Defendants should be granted in its entirety.

Dated:  New York, New York
         May 31, 2005

Respectfully submitted,

KAPLAN & LEVENSON LLP
Attorneys for Plaintiffs
630 Third Avenue
New York, New York  10017
(212)983-6900

By:\s\Scott A. Ziluck
         SCOTT A. ZILUCK (SZ-4826)

{00077255.1 / 0538-001}                   - 25 -